# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**MRK INTERNATIONAL, LLC**,

       Plaintiff,

v.                                Case No.:  CV-09-827 MCA/DJS

**EARTHSTONE INTERNATIONAL, LLC**,

       Defendant/Third Party Plaintiff,

v.

**RICHARD L. KILEY**,

       Third Party Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Defendant/Third Party Plaintiff's *Motion To Dismiss Claims For Punitive Damages* [Doc 39], *Defendant/Third Party Plaintiff Earthstone International, LLC's Motion For Partial Summary Judgment* [Doc 45], and *Defendant/Third Party Plaintiff Earthstone International, LLC's Motion Summary Judgment* [Doc 92].  Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court grants in part and denies in part the *Motions*.

## I.    BACKGROUND

In 2007, MRK International, LLC (MRK) and Earthstone International, LLC

(Earthstone) entered into a contract for services whereby MRK promised to "provide strategic and operational guidance to the Earthstone Board of Directors," and Earthstone, in turn, would pay MRK six monthly payments of $10,000 per month between July 2007 and December 2007.  [Doc 34-1 at 1]  Richard Kiley (Kiley) was assigned by MRK to the Earthstone project.  [Id.]  Kiley is allegedly the founder and "Principal Member" of MRK.  [Doc 30 at 1]  At some point during the contractual relationship, Kiley became a member of the Earthstone Board of Directors.

In August 2009, MRK filed suit against Earthstone in this Court, alleging that Earthstone had failed to pay what was promised on the contract.  Earthstone filed a third-party complaint against Kiley, contending that he had breached his obligations to Earthstone as a member of its board and that he had acted in his own interest, rather than in the interest of Earthstone.  With permission of the Court, Earthstone amended the third-party complaint on February 24, 2010 [Doc 30], and MRK amended its complaint on March 5, 2010 in order to add a claim for punitive damages  [Doc 34].

The Court will continue to develop the factual disputes between the parties as the necessary analyses proceed.

## II.    ANALYSIS

Currently pending before the Court are two motions for summary judgment and one motion to dismiss, each filed by Earthstone.  Each motion is considered in turn.

### A.    Motion To Dismiss

Under Fed. R. Civ.P. 12(b)(6)[1], a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  The sufficiency of a complaint is a question of law, and when considering and addressing a motion to dismiss pursuant to rule 12(b)(6), a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.  See Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006).  Further, in order to withstand a rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (internal citation omitted) (Iqbal).  If a plaintiff cannot nudge the claims "across the line from conceivable to plausible," the complaint must be dismissed.  Id. at 570.

In handing down Twombly, the United States Supreme Court invalidated the longstanding rule that a complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of

---

[1]Plaintiff suggests that Fed. R. Civ. P. 12(f) is the appropriate tool for this Court to use in order to evaluate Earthstone's motion to dismiss.  That Rule permits the Court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Our Circuit has applied Rule 12(b)(6) to determine the viability of a claim for punitive damages, and this Court will do the same.  See Scheerer v. Rose State College, 950 F.2d 661, 664 (10th Cir. 1991) (dismissing a claim for compensatory and punitive damages under Rule 12(b)(6)).

his claim which would entitle him to relief." <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957).  The <u>Conley</u> standard has proved problematic over the years because it suggests that "a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery."  <u>Twombly</u>, 550 U.S. at 561 *quoting* <u>Conley</u>, 355 U.S. at 45-46.  As a result, defendants may be forced to bear the burden and expense of discovery before they are afforded a real opportunity to seek the dismissal of groundless claims, while plaintiffs may use the burdensome discovery process as leverage to induce otherwise unjustified settlement of such groundless claims.  <u>See Twombly</u>, 550 U.S. at 557-59.

A complaint is now subject to dismissal under the new standard if it does not "possess enough heft to 'sho[w] that the pleader is entitled to relief.'" <u>Twombly</u>, 550 U.S. at 557 *quoting* Fed. R. Civ. P. 8(a)2. In other words, "the mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims."  <u>Ridge at Red Hask, L.L.C. v. Schneider</u>, 493 F.3d 1174, 1177 (10th Cir. 2007).

Two "working principles" underlie the <u>Twombly</u> standard.  <u>Iqbal</u>, 129 S.Ct. at 1949.

First, the tenet that a court must accept as true all of the allegations

> contained in a complaint is inapplicable to legal conclusions.  Threadbare
> recitals of the elements of a cause of action, supported by mere conclusory
> statements, do not suffice. . . . Second, only a complaint that states a
> plausible claim for relief survives a motion to dismiss.  Determining
> whether a complaint states a plausible claim for relief will . . . be a context-
> specific task that requires the reviewing court to draw on its judicial
> experience and common sense.

Id. at 1949-50 (internal citations omitted).  Thus, in order to evaluate a motion to dismiss,

the Court engages in a two-part inquiry by initially identifying those allegations that are

nothing more than legal conclusions and therefore "not entitled to the assumption of

truth" and then considering whether the factual allegations "plausibly suggest an

entitlement to relief."  Id. at 1951.

Turning to the *First Amended Complaint*, MRK has alleged that it provided

Earthstone with an invoice of unpaid fees, that Earthstone disputed the invoice and

offered to settle the amount due for $215,000, that MRK accepted Earthstone's settlement

offer, and that Earthstone failed to pay the settlement or the additional $30,000 that had

accrued on the contract.  [Id. at 1-2]  MRK further alleged that Earthstone's breach of

"the settlement agreement was willful, wanton, malicious, reckless, and was done in bad

faith and with full knowledge of the consequences of that breach."  [Doc 34 at 2]  As a

basis for this allegation of willful and wanton conduct, MRK points to Earthstone's third-

party suit against Kiley, which was filed despite Earthstone's "prior express and

enforceable promise not to do so."  [Doc 42 at 2]  These factual allegations, MRK argues,

are sufficient to state a claim for punitive damages under New Mexico law.

The New Mexico Court of Appeals has explained that in New Mexico, punitive

damages are available in breach of contract cases "as long as the wrongdoer's conduct is willful, wanton, malicious, reckless, oppressive, or fraudulent and in bad faith." Bogle v. Summit Inv. Co., LLC, 2005-NMCA-024, ¶ 28, 137 N.M 80, 107 P.3d 520. Nevertheless, the Court clearly stated that "[a]n intentional breach by itself ordinarily cannot form the predicate for punitive damages, not even when the breach is flagrant, that is, when there is no question that the conduct breaches the contract, even if the other party will clearly be injured by the breach." Id. The Bogle Court provided examples of circumstances that would justify punitive damages in a breach of contract case, including intentional breach accompanied by fraud or "when the breaching party intends to inflict harm on the non-breaching party or engages in conduct which violates community standards of decency." Id. ¶¶ 28-29.

In Bogle, the defendant knew that the plaintiff was entitled to a commission under the contract and nevertheless did not pay the commission—this alone was insufficient to support punitive damages. Id. ¶¶ 30-31. The trial court, however, found that the defendant entered into a separate agreement with another party with the intention of depriving the plaintiff of what was due to him. Id. ¶ 30. This conduct, the trial court found, was not justifiable and "was motivated by an improper purpose to divert the commission" to the defendant. Id. The Court of Appeals concluded that these findings established sufficiently egregious behavior to support punitive damages because no legitimate business reason supported the breach, and the defendant's "acts and motive fits the standard for malicious conduct." Id. ¶ 32.

MRK asserts that the plausibility standards enunciated in <u>Twombly</u> and <u>Iqbal</u> have no bearing on the issue before the Court.  [Doc 42 at 3]  Instead, it insists that "the only issue is whether Earthstone's second breach of contract brings it within the rule of <u>Bogle</u>."  [<u>Id.</u>]  I disagree.  The question of whether MRK has sufficiently alleged facts to support its claim for punitive damages necessarily requires the Court to apply the federal pleading standard—<u>Twombly</u> and <u>Iqbal</u>—to the elements of a punitive damages claim, which are established by state law.  MRK must therefore allege facts in its complaint to make a claim for punitive damages plausible.

Applying <u>Twombly</u> principles to MRK's complaint, MRK has failed to state a claim for punitive damages under <u>Bogle</u>.  Considering all of the facts alleged in the amended complaint and those facts that MRK has put before the Court that were not alleged in the amended complaint—regarding Earthstone's third-party suit—MRK has alleged only facts supporting an intentional breach of the contract and the settlement agreement, without any additional facts to support "willful, wanton, malicious, reckless, oppressive, or fraudulent" conduct.  <u>Bogle</u>, 2005-NMCA-024, ¶ 28.  MRK bewilderingly states that

> If Earthstone was willing to bring a third-party complaint against Mr. Kiley despite its prior express and enforceable promise not to do so, MRK believed Earthstone's breach of its settlement agreement with MRK was intentional, willful and malicious, and that Earthstone knew it was acting in a culpable manner when it committed that breach.

[Doc 42 at 2]  Earthstone's third-party suit, even if filed in violation of a separate

agreement between the parties, has no bearing on the conduct or intentions surrounding the alleged breach of the settlement agreement.  According to MRK, the settlement agreement was reached in February of 2009.  [Doc 34 at 2]  Earthstone did not file its third-party complaint against Kiley until October 2009.  [Doc 9]  MRK does not explain the connection between the filing of the third-party complaint and Earthstone's "culpable manner" of breaching the settlement agreement.  [Doc 42 at 2]  It does not explain how actions taken in October 2009 shed light on decisions that were made eight months earlier, in February.  Indeed, the facts alleged and argued by MRK bear a remarkable resemblance to the facts that the Bogle Court *rejected* as sufficient to "form the predicate for punitive damages."  Id. ¶ 28.  MRK has essentially alleged that Earthstone intentionally breached the settlement agreement and knew that MRK would be harmed by such breach.  According to the New Mexico Court of Appeals, the fact that one party allegedly knew that the other party was entitled to the benefit of the settlement agreement is not enough to support punitive damages.  Id. ¶ 31.  The allegations must encompass additional culpable conduct.  See id. ¶ 28 (requiring conduct that is "sufficiently malicious, oppressive, fraudulent, or committed recklessly with wanton disregard for [the] plaintiff's rights").

The facts that are alleged in the complaint and that are further expounded upon in MRK's briefing do not support a plausible claim (1) that Earthstone committed an intentional breach that was accompanied by fraud, (2) that Earthstone intended to inflict specific harm on MRK by breaching the contract, or (3) that Earthstone engaged in

conduct that violates community standards of decency.  Id. ¶ 28-29.  Accordingly, MRK

has failed to allege a claim for punitive damages under New Mexico law.[2]  See id.

Earthstone's *Motion To Dismiss Claims For Punitive Damages* [Doc 42] is therefore

granted.

**B.**   **Summary Judgment Motions**

Also outstanding are two summary judgment motions, both of which were filed by

Earthstone.

**1.**   **Standard for Review**

Summary judgment under Fed.R.Civ.P. 56(c) "should be rendered if the pleadings,

the discovery and disclosure materials on file, and any affidavits show that there is no

genuine issue as to any material fact and that the movant is entitled to judgment as a

matter of law."  Fed.R.Civ.P. 56(c)(2).  "When a motion for summary judgment is

properly made and supported, an opposing party may not rely merely on allegations or

denials in its own pleading. . . ."  Fed.R.Civ.P. 56(e)(2).  Instead, "its response must . . .

_____

[2]  The parties do not dispute the application of New Mexico law to the punitive damages claim.  Nevertheless, the original contract between the parties included a choice of law clause, electing the law of Ohio.  Our Circuit has indicated that, under these circumstances, all claims that are premised on the agreement—regardless of whether the claims require construction of the agreement—should be evaluated pursuant to the parties' chosen law.  See McBride v. Market St. Mortgage, No. 07-8044, * 13 (June 2, 2010) (unpublished).  If, however, the law of Ohio is applied to the punitive damages claim, the result is the same.  Ohio does not permit the recovery of punitive damages on pure contract claims.  See Burns v. Prudential Sec., Inc., 167 Ohio App.3d 809, 2006-Ohio-3550, ¶99, 857 N.E.2d 621 (2006) ("The general rule in Ohio is that punitive damages may not be recovered in a breach-of-contract action.").  The Ohio courts will permit a punitive damages award "if the facts of the case show an intentional tort committed independently, but in connection with a breach of contract. . . ."  Id.  MRK has alleged no such independent intentional tort.  Accordingly, the punitive damages claim would also be dismissed under Ohio law.

set out specific facts showing a genuine issue for trial."  Id.  Judgment is appropriate "as

a matter of law" if the nonmoving party has failed to make an adequate showing on an

essential element of its case, as to which it has the burden of proof at trial.  See Celotex

Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Lopez v. LeMaster, 172 F.3d 756, 759

(10th Cir. 1999).

In order to warrant consideration by the Court, the factual materials accompanying

motion for summary judgment must be admissible or usable at trial (although they do not

necessarily need to be presented in a form admissible at trial).  See Celotex, 477 U.S. at

324.  It is not the court's role, however, to weigh the evidence, assess the credibility of

witnesses, or make factual findings in ruling on a motion for summary judgment.  Rather,

the Court assumes the evidence of the non-moving party to be true, resolves all doubts

against the moving party, construes all evidence in the light most favorable to the non-

moving party, and draws all reasonable inferences in the non-moving party's favor.  See

Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

## 2.    Motion for Partial Summary Judgment

The Court turns first to Earthstone's  motion for partial summary judgment,  which

is related to one of Kiley's affirmative defenses.  In his answer, Kiley relies, as an

affirmative defense, on a letter signed by MRK, Kiley, and Earthstone (the "indemnity

letter"), which contained the following clause:

> 3.    Covenant Not to Sue.        MRK, Kiley and their Agents are
> not guarantors of the financial or other success of Earthstone or of MRK's

> interim management and financial consulting services rendered to
> Earthstone.  Earthstone, its officers, directors, shareholders and Debtholders
> acknowledge the foregoing and irrevocably covenant that Earthstone, its
> officers, directors, shareholders or the Debtholders (or any party claiming
> by or through Earthstone, its officers directors, shareholders or
> Debtholders) or their respective successors and assigns will not initiate,
> maintain or pursue any litigation, action, cause of action or other
> proceeding against MRK, Kiley or their Agents relating to services
> rendered by MRK, Kiley or their Agents.

[Doc 35 at 4 (Kiley's *Answer To Amended Third Party Complaint*); Doc 45-1 at 2 (quoted

language)]  Earthstone contends that this clause (the Covenant) does not apply to preclude

its third-party suit against Kiley and moves for summary judgment in order to foreclose

Kiley's reliance on the Covenant as an affirmative defense.  [Doc 45 at 1]

Kiley initially contends that summary judgment applies only to "claims" and that

the proper vehicle by which to challenge an affirmative defense is Rule 12(f)—a motion

to strike a pleading.  [Doc 57 at 2]  Earthstone responds that the Supreme Court of the

United States has stated that Rule 56 is intended to "isolate and dispose of factually

unsupported claims or defenses."  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

[Doc 59 at 2]  Earthstone maintains that because it has placed before the Court materials

apart from the pleadings, Rule 56 is the most appropriate mechanism.

"[A] motion to strike that . . . is directed toward an insufficient defense . . . has

been handled as a summary-judgment motion when supported by extra-pleading

material."  10A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure §

2713 at 224 (1998); see  Allen v. G.D. Searle & Co., 708 F.Supp. 1142, 1147 (D. Or.

1989) ("If matters outside the pleadings are presented for consideration, the motion will

be treated as one for partial summary judgment." ); <u>S.E.C. v. Alexander</u>, 248 F.R.D. 108,

110 (E.D. N.Y. 2007) ("[T]he great weight of authority suggests that when both parties

have submitted evidence outside the pleadings in briefing a motion to strike, the court

may treat the motion as one for partial summary judgment pursuant to Rule 56.").  In the

present case, the Earthstone submitted to the Court extra-pleading material, along with its

motion for partial summary judgment, and MRK has not opposed the Court's use of or

reference to those documents.  Accordingly, the Court will evaluate Earthstone's *Motion*

as a motion for partial summary judgment under the Rule 56 standard, which was

established in Section II.B.1.

      At the outset, the Court notes that both the Consulting Agreement and the

indemnity letter contain choice of law clauses, in which the parties elected Ohio law to

govern the agreements.  [Doc 45-1 at 2, Doc 45-2 at 3]  This Court applies New Mexico

law in order to determine whether to enforce the choice of law provision.  <u>See Vikus v.</u>

<u>Beatrice Co.</u>, 127 F.3d 936, 9441 (10th Cir. 1997) ("A federal court sitting in diversity . .

. must apply the substantive law of the forum state, including its choice of law rules.").

New Mexico courts have "strongly endorsed the view that the rights of the parties to a

contract are primarily determined by the terms of the contract."  <u>Reagan v. McGee</u>

<u>Drilling Corp.</u>, 1997-NMCA-014, ¶ 7, 123 N.M. 68, 933 P.2d 867.  Nevertheless, "New

Mexico courts may decline to enforce a choice-of-law provision in a contract

incorporating foreign law if application of foreign law would offend New Mexico public

policy."  <u>Pina v. Gruy Petroleum Mgmt. Co.</u>, 2006-NMCA-063, ¶ 13, 139 N.M. 619, 136

P.3d 1029.  The parties have not advanced any argument that the Ohio principles of

contract construction and enforcement would violate New Mexico public policy.  Indeed,

the parties have not argued that the laws of Ohio differ substantially from those of New

Mexico.  Accordingly, the Court will proceed pursuant to the substantive laws of Ohio.

Ohio law treats the construction of a written contract as a matter of law.  <u>See</u>

<u>Saunders v. Mortensen</u>, 101 Ohio St.3d 86, 2004-Ohio-24, ¶ 9, 801 N.E.2d 452.  It is well

established that "a contract is to be read as a whole and the intent of each part gathered

from a consideration of the whole."  <u>Id.</u> ¶ 16.  The primary role of the court is "to

ascertain and give effect to the intent of the parties," and the courts "presume that the

intent of the parties to a contract is within the language used in the written instrument."

<u>Id.</u> ¶ 9.  If the intent of the parties can be determined from the plain language of the

agreement, "there is no need to interpret the contract."  <u>Id.</u>  If, however, "the language in

a contract is reasonably susceptible of more than one interpretation, the meaning of the

ambiguous language is a question of fact."  <u>Kincaid v. Erie Ins. Co.</u>, 183 Ohio.App.3d

748, 2009-Ohio-4372, ¶ 19, 918 N.E.2d 1036.

In <u>Glaspell v. Ohio Edison Co.</u>, 29 Ohio St.3d 44, 505 N.E.2d 264 (1987), the

Supreme Court of Ohio determined that "absent specified public policy exceptions, the

law of Ohio generally allows enforcement of indemnity agreements."  <u>Id.</u> at 46, 505 N.E.

2d at 266.  Kiley relies on <u>Glaspell</u> in order to rebut Earthstone's motion, and he

maintains that the courts of Ohio would "unequivocally" enforce the Covenant.  [Doc 57

at 4]  Earthstone, however, is not arguing that the Covenant is not enforceable.

Earthstone contends that the Covenant, as written, does not apply to the conduct that it has alleged in the third-party complaint.  In the Covenant, Earthstone promised that it would not "initiate, maintain or pursue any litigation, action, cause of action or other proceeding against MRK, Kiley or their Agents *relating to services rendered by MRK, Kiley or their Agents*."  According to Earthstone, this was a promise not to sue regarding only the services that were bargained for in the Consulting Agreement.  Earthstone maintains that its third-party complaint relates only to Kiley's performance as an Earthstone board member and not to any services that were subject to the Consulting Agreement.  Thus, Earthstone argues that the Covenant, enforceable though it may be, does not bar its third-party claims.  [Doc 45 at 8]

The question before the Court, therefore, is whether the parties intended for the Covenant to govern the activities that are subjects of Earthstone's third party complaint against Kiley.  See Saunders, 101 Ohio St.3d 86, 2004-Ohio-24, ¶ 9 (describing the primary role of the court as to "ascertain and give effect to the intent of the parties").  Presuming that "the intent of the parties to a contract is within the language used in the written instrument,"  id., the Court turns to the governing documents.  The first paragraph of the indemnity letter incorporates the Covenant and states the following:

> MRK International, LLC, an Ohio limited liability company ("MRK") has agreed under a separate letter ("Consulting Agreement") to provide certain services to Earthstone International, LLC, a Delaware limited liability company ("Earthstone"), customarily provided by a Chief Executive Offer to assist (I) Earthstone's shareholders, (ii) Earthstone's Board of Directors and (iii) certain creditors of Earthstone (the "Debtholders") in the

stabilization and growth of Earthstone.  To induce MRK to enter into the
Consulting Agreement with Earthstone, Earthstone agrees  to provide this
indemnity letter.

[Doc 45-1 at 1] By its terms, the indemnity letter applies only to services contemplated by

the "Consulting Agreement." This is particularly true given that Earthstone provided the

indemnity letter in order "induce MRK to enter into the Consulting Agreement."  [Id.]  As

a result, the third-party complaint is only barred by the Covenant if the conduct alleged

implicates the Consulting Agreement.  The Court therefore turns to the terms of the

Consulting Agreement, as well as the allegations made in the *Amended Third Party*

*Complaint*.

The Consulting Agreement explains that "Earthstone will engage MRK

International ("MRK") as an independent contractor to provide strategic and operational

guidance to the Earthstone board of Directors."  [Doc 34-1 at 1]  In addition, that

agreement states that "[u]nless authorized in writing, MRK, Kiley or their agents shall

have no right or authority, and shall not attempt to enter into contracts or commitments in

the name, or on behalf, of Earthstone, or to bind Earthstone in any manner or respect

whatsoever."  [Id. at 2]  As of at least December 31, 2007, Kiley was also separately

"employed" by Earthstone. According to the "Fourth Amended And Restated Operating

Agreement" (Operating Agreement), "one manager shall be the lead executive of the

Company (as determined by the other Managers).  Until such time as he is no longer

employed in such capacity by [Earthstone], Richard L. Kiley shall serve as the Manager

under this Section."  [Doc 30-1 at 2]  As "lead executive,"  Kiley was a member of the

Board of Managers, which were "appointed to manage the business and affairs" of Earthstone.  [Id. at 1]

Based on a review of these documents, it is clear that Kiley wore more than one hat for Earthstone.  He was required under the Consulting Agreement to assist Earthstone's shareholders and Directors.  He was further obligated under the Operating Agreement to function as the "lead executive" for Earthstone and to manage the business and affairs of that company.  Under the Consulting Agreement, Kiley could not enter into contracts or commitments for Earthstone; under the Operating Agreement, Kiley was permitted to "open and maintain bank accounts in the name of the Company," and was required to "cause the preparation and timely filing of all tax returns required to be filed by the Company."  [Doc 30-1 at 3]  Reading the undisputed documents so as to give meaning to all of their parts, Kiley performed distinct services under the separate agreements.  See Foster Wheel Envirespose, Inc. v. Franklin County Convention Facilities Auth., 78 Ohio.St.3d 353, 362, 1997-Ohio-202, 678 N.E.2d 519, 526 (1997) ("In the construction of a contract courts should give effect, if possible, to every provision therein contained, and if one construction of a doubtful condition written in a contract would make that condition meaningless, and it is possible to give it another construction that would give it meaning and purpose, then the latter construction must obtain." (internal quotation marks and citation omitted)).  The next question, then, is whether the *Amended Third Party Complaint* addresses Kiley's role under the Consulting Agreement, which implicates the indemnity letter as was explained above, or Kiley's role under the

Operating Agreement, which does not implicate the indemnity letter.  Earthstone's factual

allegations can be summarized in the following manner.  During the parties' relationship,

Kiley recommended a reduction in MRK's compensation, which was implemented.  [Id.

at 3]  Earthstone, as a result of a meeting headed by Kiley,  agreed to pay MRK an

additional finder's fee for locating new investors.  [Id. at 3-4]  No additional investors

were found by MRK, but MRK, by way of Kiley demanded additional payments.  [Id. at

4]  Kiley, acting as Chairman of Earthstone's Board of Directors, called a meeting of the

Board and included MRK's demand for payment on the agenda.  [Id. at 5]  Earthstone

alleges that "Kiley pressured each board member to express to him an opinion whether

the work he had performed deserved additional compensation."  [Id.]  The Board,

including Kiley, voted to offer MRK a settlement.  Kiley did not accept the offer for

MRK, but instead, a few days later, submitted a counteroffer.

The *Amended Third Party Complaint* states six counts against Kiley:  (1) violation

of the duty of care to Earthstone under the Operating Agreement; (2) breach of the duty of

loyalty under the Operating Agreement; (3) breach of fiduciary duty contrary to the

Operating Agreement; (4) negligence per se, contrary to NMSA 1978, § 53-11-35(B)

(1987), which governs the obligations of directors to perform their duties in good faith

and in  the best interest of the company; (5) indemnity against MRK's claims, based on

Kiley's alleged breach of duties pursuant to the Operating Agreement; and (6) piercing

the corporate veil so as to allege Kiley's personal liability for actions that are deemed to

have been taken by Kiley as agent or representative of MRK.  [Doc 30 at 6-10] The facts

alleged to support Earthstone's complaint derive entirely from Kiley's actions as a member of the Board:  (1) that he improperly placed his own interests and MRK's interests ahead of Earthstone's interests, (2) that he failed to conduct himself in good faith as a board member or the chairman of the board, (3) that he voted for a settlement that would benefit him personally but that was contrary to Earthstone's best interests, and (4) that he breached his fiduciary duty to Earthstone's shareholders.

Having reviewed the documents and the third-party complaint, the  Court concludes that the indemnity letter does not apply to the third-party complaint.  Kiley had two roles with Earthstone—one as an advisor to the Board under the Consulting Agreement and one as a member of the Board under the Operating Agreement.  By voting with the Board regarding his own compensation, he was acting as a Board Member and not an advisor.  Earthstone's *Amended Third Party Complaint* arises from Kiley's actions related to his voting to offer himself a settlement agreement, as well as other actions Kiley allegedly took that were in his own best interest and MRK's best interest, but contrary to his obligations to Earthstone as a Board member.  The "services" contemplated by the Consulting Agreement are not implicated by the *Amended Third Party Complaint*.  Because the indemnity letter, by its terms, applies only to the Consulting Agreement, the indemnity letter does not, as a matter of law, apply to bar the *Amended Third Party Complaint*.

Moreover, suit is permissible against Kiley pursuant to *both* agreements if it is alleged that he acted intentionally or in bad faith.  The indemnity letter specifically states

that "[t]he indemnification obligation set forth herein does not apply to intentional misconduct of any Indemnified Party."  [Doc 45-1 at 1]  The letter defines "intentional misconduct" as conduct that is "intentionally done, or intentionally omitted to be done, by an Indemnified Party not in good faith and without reasonable belief that such party's action or omission was in or not opposed to the best interests of Earthstone."  [Id.]  The Operating Agreement has a similar provision:

> No Member, Manager, or Officer shall be personally liable to the Company in monetary damages for breach of a duty to the Company unless it is proved in a court of competent jurisdiction that such Person's action or failure to act (I)  was not in good faith, (ii) was undertaken with deliberate intent to cause injury to the Company or undertaken with reckless disregard for the best interests of the Company, (iii) resulted in an improper personal benefit to such Person or any affiliates at the expense of the Company, (iv) constituted fraud or deceit, or (v) was a knowing violation of the law.

[Doc 30-1 at 33]  All of the allegations in the *Amended Third Party Complaint*, as outlined above, satisfy both provisions because the *Complaint*, in each count, alleges that Kiley acted in bad faith and against the interest of Earthstone. Thus, even if the indemnity letter were applicable to the facts before the Court, the terms of the letter specifically state that it does not apply to the type of conduct alleged.

At no point has Kiley disputed the contents of the documents that the Court has considered. Nor has Kiley argued that his services as Board member were services contemplated by the Consulting Agreement.  Kiley has devoted his resources to arguing that the courts of Ohio would enforce the Covenant and has not addressed whether the indemnity letter applies to the alleged conduct or whether the alleged conduct is properly

considered "intentional misconduct." Given the nature of the allegations in the *Amended Third Party Complaint*, the plain language of the Operating Agreement and the Consulting Agreement, and the "intentional misconduct" language in the indemnity letter, Kiley cannot prevail by relying on the indemnity letter as a defense.  Accordingly, Earthstone's *Motion* is granted.

**3.**      **Motion For Summary Judgment**

Earthstone has also filed a motion for summary judgment on MRK's complaint. Earthstone makes three arguments in support of its *Motion*.  First, the partes did not enter into an enforceable settlement agreement, and therefore, no breach of that settlement agreement could occur.  [Doc 92 at 7-8]  Second, Earthstone maintains that the parties agreed to reduce, and then to cease, monthly payments to MRK.  [Id. at 9]  As a result, Earthstone argues that it did not breach the services agreement by failing to make $10,000 monthly payments to MRK after May 2008.  [Id. at 9-10]  Finally, Earthstone insists that MRK cannot factually support its claim for punitive damages.  [Id. at 9]

The punitive damages question was addressed in Section II.A, wherein the Court granted Earthstone's motion to dismiss MRK's claim for punitive damages.   The remaining issues regarding the settlement agreement and the services agreement are addressed in turn.

**a.**      **The Settlement Agreement**

The New Mexico courts treat a settlement agreement as "a species of contract." Builders Contract Interiors, Inc. v. Hi-Lo Indust., Inc., 2006-NMCA-053, ¶ 8, 139 N.M.

508, 134 P.3d 795.  "A contract is a legally enforceable promise."  <u>Nance v. L.J. Dollof</u>

<u>Assoc., Inc.</u>, 2006-NMCA-012, ¶ 19, 138 N.M. 851, 126 P.3d 1215.  In order to be

considered "legally enforceable," there must be between the parties "an offer, acceptance,

consideration, and mutual assent."  <u>Id.</u>  The courts have made clear that"[f]or an offer and

acceptance to create a binding contract, there must be an objective manifestation of

mutual assent by the parties to the material terms of the contract."  <u>Pope v. Gap, Inc.</u>,

1998-NMCA-103, ¶ 11, 125 N.M. 376, 961 P.2d 1283.

On February 26, 2009, as referenced in the minutes from the board meeting of that

day, Earthstone offered Kiley $215,000 to settle a $275,000 invoice for outstanding fees.

[Doc 92-2 at 8-9]  On February 27, 2009, Kiley sent an email accepting the $215,000

offer.  [Doc 34-3 at 1]  According to the undisputed evidence, prior to the offer and the

acceptance, throughout negotiations, Earthstone expressed reservations about its ability to

pay the invoice and Kiley acknowledged the company's financial position.  [<u>Id.</u>; Doc 92-9

at 8-9; 96-5 at 3]  After the parties agreed to the amount, $215,000, they continued to

negotiate how the debt would be paid but failed to reach an agreement.  [Doc 96-3 at 4;

Doc 92-2 at 12, 13-14]

Earthstone argues in its *Motion* that the method of payment is a material term to

the settlement contract, the absence of which negates any agreement.  To support this

argument, Earthstone points to Kiley's continued attempts to settle the dispute, after the

parties purportedly agreed to $215,000 as an amount.  Kiley emailed a Linnea Bonacci on

March 17, 2009, explaining that "the Board and I have agreed a settlement of $215K for

my 2008 invoice." [Doc 92-2 at 11]  The email continues, "[w]hile not yet formally

agreed, this will take the form of a note similar to Triton's due in December 31, 2010."

[Id.]  One day later, on March 18, 2009, Kiley sent an email to Matt Loftus, which stated

the following:

> The Company and MRK have agreed to a settlement of $215,000.00 per the
> attached minutes from the Feb. 26, 2009 Board Meeting.
>
> The remaining issue is how the Company will settle this obligation.  I have
> told the Board that I would accept a secured, promissory note that parallels
> the note that Growstone is holding.
>
> Attached is the proposed note that my lawyer has drafted.  I'd like you to
> review this for the Company prior to me seeking Board approval.

[Id. at 10]  The email continues to explain proposed details of the settlement payment.

Kiley sent another email on March 24, 2009, to which he attached "a proposed settlement

to the MRK International LLC invoice of $275,000."  [Id. at 12]  In the March 24, 2009

email, Kiley makes clear that he has "not yet sought formal approval from the Board

although it has been generally discussed."  [Id.]

Finally, Earthstone has set forth a string of emails between Kiley and two other

persons, which highlights the dispute about the method of payment.  The initial email,

sent by Andrew Ungerleider on April 1, 2009, expresses confusion about settlement

terms: "this whole deal has me confused—I never envisioned you becoming a creditor."

[Id. at 14]  He continues to explain the reasons for the deal with a company called Triton

and asks "how can I sign another note for 215k [and] pledge additional shares etc when

we are barely solvent . . .?  I would not have agreed in the last phone call had I known this is how you wanted to be paid." [Id.]  After further explanation, Ungerleider states that "I just don't think I can sign this sort of deal and hope you will understand & consider the equity deal of 5% and accelerated vesting as we had discussed." [Id.]  In response to this email, John Bessone disagreed with Ungerleider's recollection of events and stated that he recalled that the settlement would "be in the form of some kind of payout, not equity." [Id. at 13]

Based on this evidence—Kiley's continued pursuit of payment and the subsequent disagreement between the players as to how to effectuate payment—Earthstone argues that the parties never agreed to the material terms of the settlement.  As a result, Earthstone maintains that there can have been no breach in the failure to pay $215,000 to Kiley.

MRK responds that the method of payment did not constitute a material term to the settlement agreement.  [Doc 96 at 12]  Instead, MRK focuses on the offer, $215,000, and Kiley's acceptance, in order to argue that the parties agreed to the only material term—price.  [Id. at 13]  MRK contends that had Earthstone intended to condition its offer on a particular method of financing, it could have—but it did not.  [Id. at 12]  MRK does not dispute that the parties disagreed about the method of payment.  Instead, MRK takes the position that the disputes regarding the method of payment did not undercut Earthstone's obligation to pay the agreed amount, $215,000.

In support of its position, MRK first sets forth Kiley's deposition, in which he

testified that the purpose of the February 26, 2009 board meeting resolution was "to agree on what was owed."  [Doc 96-2 at 5]  Kiley further declared that after that meeting, there was "no discussion about if [the amount] was to be paid," but rather "[d]iscussion was only about how it would be paid."  [Id.]  Bessone testified during his deposition that no conditions were attached to the February 26, 2009 offer regarding how it would be paid.  [Doc 96-3 at 4]  Ungerleider gave the same testimony:  "[t]he settlement offer adopted at the February 26th meeting was not conditioned on it being paid in equity."  [Doc 96-5 at 3]  Ungerleider testified that the settlement was not conditioned on any sort of payment, but instead "to settle . . . the whole deal with Rich, which had been years in the making . . . that I agreed that the money was owed and due."  [Id.]

Bessone, in his email exchange with Kiley, stated that he voted "'yes,' in part, for the principle of the thing, we owe you the money because you did the work. . . ."  [Doc 92-2 at 13]  He  further pointed out the position of one dissenting board member, who objected to the settlement offer precisely because there were no conditions as to how it would be paid.  [96-5 at 3]  The dissenting board member, Ivan Faggen, requested that his dissent be reflected in the minutes for the February 26, 2009 meeting and he articulated his disagreement in the following manner:

> I voted no on the resolution concerning the MRK invoice because of the Board's lack of determination of how the settlement would be settled.  I believe it is inappropriate for the Board to commit to a liability in dispute without having full knowledge as to how it is to be paid, especially when they do not have sufficient funds to make the payment of the liability to which they have agreed.

[Doc 92-2 at 8]  Based on this statement, the manner-of-settlement issue was raised prior to the time the board decided to make the offer and it could be determined that the board decided to make the $215,000 offer with the intention of later working internally to generate the funds or a proposal of payment.

All of the evidence proffered by the parties demonstrates that the issue here is truly one of intent:  when the parties agreed between February 26, 2009 and February 27, 2009 to a settlement figure of $215,000, did that signal an intent to pay the money, regardless of the source?  A reasonable jury could conclude that Earthstone set aside its concerns about how to fund the settlement in order to resolve the payment issue with Kiley because he did the work and deserved to be paid.  Alternatively, a reasonable jury could conclude that Earthstone and Kiley had begun negotiating the settlement and agreed to the price in February, but that negotiations stalled thereafter, with no agreement reached by the parties.  In its reply brief, Earthstone cites a case from this District to argue that the form of payment is a material term in "many contracts."  [Doc 97 at 10, citing Grubb v. Kempthorne, No. CIV 06-1260 JB/DJS, 2008 WL 5999637, (D.N.M. August 25, 2008).] Indeed, Grubb explains that "[m]aterial terms include areas such as subject matter, price, payment terms, quantity, quality, and duration, such that the promises and performance to be rendered by each party are reasonably certain." Id. at * 13 (internal quotation marks and citation omitted).  In the present case, however, whether the parties agreed to the material terms depends on the scope of their intent.  As explained above, the evidence could support a reasonable inference either that the parties intended to solidify

Earthstone's liability or that the parties did not intend to enter a binding agreement as to

liability as a result of the offer and acceptance.  See id. (concluding that "both

interpretations are reasonable, that the Settlement Agreement is ambiguous, and that the

factfinder must interpret the parties' intent and whether there was a meeting of the minds"

and denying summary judgment).

New Mexico Courts have long held that "[t]he parties' intent to become bound to a

contract . . . [is a] question[] of fact depending on the  circumstances of the case."  Balboa

Const. Co., Inc. v. Golden, 97 N.M. 299, 303, 639 P.2d 586, 590 (Ct. App. 1981).  In

Stites v. Yelverton, 60 N.M. 190, 289 P.2d 638 (1955), the New Mexico Supreme Court

faced a question of material terms.  The Court explained that

> [w]hat is intended is a question of fact depending upon the circumstances of
> the case. Among the circumstances to be considered are: Do the
> negotiations indicate a written draft was intended as the binding expression?
> Is the contract of a type usually put in writing? Has there been agreement
> upon all of the essential and material terms of the contract?

Id. at 193, 289 P.2d at 630.  In the present case, the parties dispute whether they agreed to

the material terms—they dispute their respective intentions.

The question of intent is a close one.  The materiality of specific contract terms

appears to be settled in some cases, where courts declare that "[r]ate of interest is a

material term in a contract," First Nat'l Bank in Albuquerque v. Abraham, 97 N.M. 288,

291, 639 P.2d 575, 578 (1982) (Abraham), or that "the price is, of course, a material

term." Beaver v. Brumlow, 2010-NMCA-033, ¶ 25, 148 N.M. 172, 231 P.3d 628

(internal quotation marks and citation omitted).  But these declarations are made in the context of the agreement contemplated by the parties.  In <u>Abraham,</u> the interest rate was set in the contract and then was later changed, and the court held that the rate of interest was a material term that could not be altered without the parties' consent.  97 N.M. at 291, 639 P.2d at 578.  The rate of interest was contemplated and included in the agreement, and therefore could not be changed without the consent of the parties.   In <u>Beaver,</u> the Court expounded on the initial bald statement, "[the price is, of course, a material term," and stated that "[a] valid contract of sale may be made without any stipulation as to the price, the law in such case implying that the price is the reasonable value of the thing which is the subject-matter of the agreement."  2010-NMCA-033, ¶ 25 (internal quotation marks and citation omitted).  Thus, price is a material term, but it can be implied from the circumstances if the situation warrants.

These cases do not offer a single rule regarding which terms are material to a contract, but instead conduct a fact-based analysis, which determines the parties' intentions from the circumstances of the agreement.  As a result, summary judgment on this issue is not appropriate at this time.  <u>See</u> <u>Building Mart, Inc. v. Allison Steel Mfg. Co.,</u> 380 F.2d 196, 199 (10th Cir. 1967) ("This court very recently had occasion again to note the impropriety of summary judgment on the issue of intent when the evidence was susceptible of conflicting inferences.").

**b.**      **The Services Agreement**

In the second part of the *Motion*, Earthstone focuses on the Services Agreement.

In relevant part, the Services Agreement states the following:

>    1.   <u>Terms of Engagement</u>.  The term of this Agreement shall begin on July 1, 2007 and end on December 31, 2007.  It may be extended on a month-to-month basis by mutual agreement.
>
>    . . . .
>
>    3.   Compensation.
>
>    (a)   In consideration of services performed by MRK, Earthstone agrees to pay MRK Sixty Thousand Dollars ($60,000.00), to be disposed on the First (1st) day of each month in Six (6) monthly payments (July - December 2007) of Ten Thousand Dollars ($10,000.00) each, except that, in the event of termination of this Agreement prior to December 31, 2007, pursuant to Section 2(a) or 2(b) above, no further payment shall be required pursuant to this sentence following such termination.  If this engagement is extended beyond December 31, 2007, Earthstone shall pay MRK at the rate of Ten Thousand Dollars ($10,000.00) per month, payable on the first day of each month, unless otherwise agreed between Earthstone and MRK.

[Doc 92-1 at 1]  The settlement agreement, discussed in part II.B.3.a, encompassed the purportedly unpaid fees between May through December of 2008.  [<u>See</u> Doc 34-2 at 1; Doc 34-3]  MRK additionally seeks $30,000 in fees, at $10,000.00 per month, for services rendered between January 2009 through March 2009.  [<u>See</u> Doc 34 at 2]  MRK maintains that Earthstone failed to abide by the payment obligation set forth above in the Services Agreement.

Earthstone argues that MRK is not entitled to additional fees because the Services Agreement expired by its terms on December 31, 2007 and that in May 2008, the parties agreed to reduce the monthly fee to $5,000.  After that, in July 2008, Earthstone asserts that the parties agreed to discontinue Earthstone's obligation to pay a monthly fee to

MRK.  For support, Earthstone points first to an email sent on May 1, 2008 from Kiley to

Bessone, Faggen, and Ungerleider.  [Doc 92-1 at 4]  In that email, Kiley stated that

"[a]ssuming you agree, I recommend that compensation to MRK International for my

services to be reduced from $10,000/month to $5,000/month effective May 1 and to zero

when an Earthstone Finance Manager is hired."  [Id.]  According to Earthstone, this

email, together with Kiley's supporting testimony, indicates that the rate of payment on

the Services Agreement was "otherwise agreed between Earthstone and MRK."  [Doc 92-

1 at 7; Doc 92-1 at 1]

      Payments of $5,000 were made by Earthstone to MRK in May 2008 and June

2008.  [Doc 92-1 at 7]  After that, however, no additional monthly payments were

tendered.  [Id.]  MRK did not object to the zero payments until October 2008.  [Id. at 8-9]

Earthstone argues that Kiley agreed not to receive further payments after May 2008, as

evidenced by his answer to Earthstone's Request for Admission No. 12:

> REQUEST FOR ADMISSION NO. 12:  [sic] Admit that you [Kiley]
> informed Earthstone's Board of Directors/Board of Managers that neither
> MRK nor Andrew Ungerleider would be paid following May 2008.
>
> RESPONSE:  Admitted but see comment to Admission No. 11
> above.

[Doc 92-1 at 11]  The referenced "comment" states that "this reduction in fee was based

on Faggen's professed agreement to paying MRK a preferred stock equity position

equivalent to the 4% fundraising fee."  [Id.]  In his deposition, Kiley explains that he did

not object to not being paid until it became clear that the agreement with Faggen "was

going to be dishonored."  [Doc 92-1 at 9]

MRK does not deny that Kiley agreed to the reductions in fees.  Instead, MRK contends that Earthstone's statement of the circumstances is not complete because it does not account for the equity agreement with Faggen.  According to Kiley, he agreed to reduce MRK's fee in return for a "preferred stock equity position equivalent to $200,000. . . ."  According to Kiley, this exchange was approved by Faggen—an Earthstone Board member.  [Doc 96 at 3]  Earthstone responds that MRK's only evidence to support this additional agreement regarding equity is an affidavit submitted by Kiley and that the affidavit is a sham, "intended to create a false factual issue to overcome summary judgment."  [Doc 97 at 8]  Earthstone additionally maintains that Kiley's affidavit, setting forth the details of the equity agreement with Faggen is a sham because it "directly contradicts Kiley's sworn testimony in his deposition."  [Doc 97 at 4]

In assessing a conflict between an affiant's prior sworn testimony and the sworn affidavit, courts consider whether:

> (1) the affiant was cross-examined during his earlier testimony; (2) the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence; and (3) the earlier testimony reflects confusion which the affidavit attempts to explain.

Law Co., Inc. v. Mohak Constr. & Supply Co., Inc., 577 F.3d 1164, 1169 (10th Cir. 2009) (internal quotation marks and citation omitted).  In Law Co., Inc., the Circuit required that the district courts to consider whether an affidavit raises a sham issue and to identify how

the affidavit conflicts with prior sworn testimony.  Id. at 1169.  The Court begins with this issue—whether the affidavit conflicts with any sworn testimony.

Earthstone argues that Kiley's assertion in the affidavit that the equity agreement was made with Earthstone contradicts his deposition testimony.  [Id.]  Review of Kiley's deposition testimony demonstrates no conflict.  During the deposition, Kiley testified that Faggen acted as an Earthstone board member and that the alleged agreement was discussed at an Earthstone board meeting in December 2007.  [Doc 97-1 at 2-3]  At that board meeting, Kiley testified, it "was acknowledged" that

> Ivan Faggen and I had talked, we had resolved the issue and were reporting the resolution of the issue, and Andrew Ungerleider commented that I was, MRK was taking equity as party of the deal and that was a strong determination of the confidence that MRK and I, Rich Kiley, had in the likely success of the deal, that I was going to take equity instead of cash.

[Id. at 3]  The affidavit does not contradict this deposition testimony.  It states that "[i]t was my good faith belief that Ivan Faggen specifically and the Earthstone Board in general accepted this deal . . . to exchange [a $200,000 debt] for an equity position on behalf of MRK in Earthstone ($40,000) and Growstone ($160,000)."  [Doc 96-1 at 1]  Kiley further attests that he reduced his fee in May 2008 and waived his fee thereafter based on his "equity position in the two companies."  [Id.]  The deposition testimony and the affidavit do not conflict, and accordingly, the affidavit should not be disregarded as a sham.  Whether and with whom the equity agreement was reached is a disputed factual issue that is best decided by the jury.

Earthstone also suggests that the Court should disregard the affidavit because it raises a claim not against Earthstone, but against a different company, Growstone.  It appears, from both Kiley's affidavit and his deposition testimony, that Faggen had significant ties to both companies and that he purportedly offered MRK equity in both companies in return for a reduced fee.  [Doc 97-1 (Deposition of Richard Kiley) at 3 "Ivan Faggen, at that time only having been an Earthstone board member, suggested and I agreed in the interest of MRK that the MRK would take senior preferred equity equivalent for that $200,000 fee and that the equity equivalent could be divided between Earthstone and Growstone."]  Thus, the equity agreement arguably concerns Earthstone, as well as Growstone, and should not be disregarded simply because both companies are involved.

Turning again to the Services Agreement, it states that it can be extended beyond December 31, 2007 by "mutual agreement."  There is no contention that the parties desired to discontinue the Services Agreement—that Earthstone wanted to disengage MRK or vice versa.  The controversy surrounds the method of payment.  As to that issue, the Services Agreement provides a default position—$10,000 per month—unless "otherwise agreed."  Arguably, the parties "otherwise agreed," between the months of May 2008, when Kiley sent the email agreeing to a reduced payment, until January 2009, when Kiley sent the invoice demanding back-payment.  Further, the parties arguably agreed to settle the payment issue for this disputed period on in February 2009 for $215,000.

Nevertheless, Earthstone continued to engage MRK between January 2009 and April 2009.  There is no evidence proffered that the parties "otherwise agreed" to an alternate payment schedule or to reduce fees for this time.  Earthstone contends that once the parties agreed to a reduced fee in May 2008, they had to again mutually agree to reinstate the original payments.  [Doc 97 at 9]  The Services Agreement does not require this result.  The Services Agreement clearly states that MRK is to be paid $10,000 "unless otherwise agreed."  At that time, in January 2009, an alternate payment plan was not "otherwise agreed."  A reasonable juror could infer from the evidence presented that MRK no longer agreed to the reduction and cessation of fees, based on Earthstone's failure to abide by what MRK contends was the whole agreement, and that at the time the invoice was submitted, the default payment provision in the contract kicked in to effect.  Alternatively, a reasonable juror could conclude that the Services Agreement continued only by mutual assent, that by January 2009, the parties did not operate under mutual assent, and that they reached no further agreement, thus rendering the entire Services Agreement, with its payment provision, unenforceable.

These are alternate reasonable readings of the Services Agreement, and it is well established that "[c]ontract language reasonably and fairly susceptible to different construction can be deemed ambiguous and open to interpretation."  Weddington v. Weddington, 2004-NMCA-034, ¶ 19, 135 N.M. 198, 86 P.3d 623.  If a contract is "reasonably and fairly susceptible to different constructions, an ambiguity exists, and summary judgment is not proper."  Sanchez v. Borrego, 2004-NMCA-033, ¶ 2, 135 N.M.

192, 86 P.3d 617; see SCO Group, Inc. v. Novell, Inc., 578 F.3d 1201, 1215 (10th Cir.

2009) ("[W]hen conflicting evidence is presented such that the ambiguities in a contract

could legitimately be resolved in favor of either party, it is for the ultimate finder of

fact—not the court on summary judgment—to interpret the contract.").

## III.   CONCLUSION

MRK has failed to allege a basis for punitive damages and cannot prevail using the

Indemnity letter as a defense.  The parties' intentions regarding the 2009 settlement are

not clear, and the Services Agreement is susceptible to more than one reasonable

interpretation.

**IT IS THEREFORE ORDERED** that the *Motion To Dismiss Claims For*

*Punitive Damages* [Doc 42] is **GRANTED**.

**IT IS FURTHER ORDERED** that *Defendant/Third Party Plaintiff Earthstone*

*International, LLC's Motion For Partial Summary Judgment* [Doc 45] is **GRANTED**.

**IT IS FURTHER ORDERED** that *Defendant/Third Party Plaintiff Earthstone*

*International, LLC's Motion For Summary Judgment* [Doc 92] is **GRANTED IN PART**

to the extent that the punitive damages claim has been dismissed, but is otherwise

**DENIED**.

**SO ORDERED** this 30th day of March, 2011, in Albuquerque, New Mexico.

M. CHRISTINA ARMIJO
United States District Judge